UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                                                    Case No: 6:24-cr-00095-JSS-LHP

WILLIE LAWRENCE NELSON JR.,

     Defendant.

_____/

## ORDER

     Defendant Willie Lawrence Nelson Jr. moves to suppress statements that he made to law enforcement, (Dkt. 38), as well as witnesses' show-up identifications of him and any in-court identifications attempted by those witnesses, (Dkt. 39).  In response, the Government agrees not to introduce identifications made by the child victim, her mother, or a pursuing witness[1] but otherwise opposes the motions.  (Dkts. 43 & 45.)  Upon consideration, for the reasons outlined below, the court grants the motions to suppress in part and denies them in part.

## BACKGROUND

     The court describes the events that led to Defendant's detention and the statements Defendant seeks to suppress.

### A. Events Leading to Defendant's Detention

---

[1] The Government represented at the July 18, 2024 hearing in this case that it did not intend to call the pursuing witness.

At 1:19PM on March 30, 2024, a woman called 9-1-1 to report that a light-skinned Hispanic man had just exposed himself to her 11-year-old daughter inside Canaveral National Seashore National Park, (Dkt. 38 at 2) and had tried to lure the daughter to come to him behind a parking-lot restroom, (Dkt. 45 at 2).  The woman said that the man had on a white hat, no shirt, and black shorts. (Dkt. 38 at 2.)  When the man emerged from behind the restroom, the victim identified him to her mother, and the mother took photos and a video of him as he fled the scene.  (Dkt. 43-1 at 2, 4, 6.)  A pursuing witness gave chase but did not catch the man, who fled through brush and dunes containing sawgrass.  (Dkt. 43 at 3.)

A large number of officers—most, if not all, wearing body-worn cameras—arrived in response to the 9-1-1 call and searched the area for the suspect.  (Dkt. 39 at 2–3; *see* Dkt. 43, Exs. 6, 7, & 8; Dkt. 45, Exs. 1 & 2; Gov't Ex. 4.)  During the manhunt, officers spoke to people at the park who saw someone matching the suspect's description jump into the ocean wearing a white hat and then leave the hat in the water.  (Dkt. 43 at 3.)  At 2:26PM, officers found and detained Defendant on a beach. (Dkt. 39 at 3–4.)  Defendant had injuries consistent with someone who ran through sawgrass.  (Dkt. 43 at 4; *see also* Dkt. 45, Ex. 1, at 37:37–40:14 (showing a paramedic tending to Defendant's injuries).)  Handcuffed and surrounded by five officers and a canine, Defendant was then escorted to a parking lot for the victim to identify him. (*See* Dkt. 45, Ex. 1, at 04:05.)

## B. Defendant's Statements

In that parking lot, at 2:30PM, an officer asked Defendant if he was at the park

with anyone else, and Defendant responded, "I was just trying to meet my girlfriend." (Gov't Ex. 4 at 3:31–:38.)   The officer followed up, "Does she know you're here waiting for her, or what?" and Defendant said that she knew.   (*Id.* at 3:39–:44.)   The officer then said, "The saltwater had to burn on those shins, man.   A little bit?" (*Id.* at 3:53–:56.)   From the footage from the body-worn cameras, Defendant seemed to agree.   (*Id.* at 3:58.)   At 2:31PM, an officer asked Defendant if he had left his hat "out there," if he had thrown it in the water, or if he did not have a hat, and Defendant shook his head no to each of these questions.   (*Id.* at 4:39–:44.)[2]   About twenty seconds later, an officer asked if one of the cars in the parking lot belonged to Defendant, and Defendant shook his head no.   (*Id.* at 5:06–:09.)   An officer then told Defendant, "You had us walking, man.   We're tired," and Defendant responded that he hoped the officers got everything "figured out."   (*Id.* at 5:38–:52.)   Defendant also said, "Crazy." (*Id.* at 5:56.)   At 2:33PM, Defendant discussed with officers the possibility of his vehicle getting towed and gave them a description of the vehicle and its possible location.   (*Id.* at 6:50–7:40.)   An officer asked Defendant if his identification was in his vehicle, and Defendant responded, "I think so, yeah."   (*Id.* at 7:39–:44.)

At 2:34PM, an officer asked Defendant for his name, recognized it as belonging to a person who earlier that day had been pulled over for a traffic infraction, and asked Defendant if he was that person.   (*Id.* at 7:46–8:03, 8:16–:19.)   Defendant nodded, said, "Yes," and added, "That's why I was acting like this."   (*Id.* at 8:03–:15.)   Defendant

---

[2] Similarly, at 2:41PM, Defendant repeatedly denied having worn a white hat.   (Gov't Ex. 4, at 14:30–:50.)

was "paranoid" and "spooked," he explained, because he had gotten pulled over for speeding. (*Id.* at 8:20–:35.) Defendant also said that he had seen the police and tried to "hide." (*Id.* at 8:37–:41.)

At 2:35PM, an officer asked Defendant for his last name again, as well as other pedigree information: namely, his birthdate, social security number, address, and telephone number. (*Id.* at 8:45–:53; *see also* Dkt. 45, Ex. 1, at 12:14–:35.) Defendant "apologize[d] for running" and repeated that he was "spooked" because "the other day," he "got pulled over for speeding." (Dkt. 45, Ex. 1, at 12:39–13:00.) The officer asked why Defendant was spooked about a minor traffic infraction like speeding, (*id.* at 13:00), and Defendant responded that he "had a little bud,"[3] saw the police, got "nervous," and "just tried to get away," (*id.* at 13:05–:13.) Defendant offered to get his ticket from his car to show officers, but an officer said that they believed him. (Gov't Ex. 4, at 11:18–:28.) Another officer asked Defendant if the ticket was for speeding, and Defendant said yes. (*Id.* at 11:24–:28.)

Defendant again explained that he "just got scared" when he saw an officer coming, that he "wasn't running" but was "just trying to avoid" another encounter

---

[3] "Bud" is common slang for marijuana. *See Bud, N.1, Additional Sense (2009)*, Oxford English Dictionary (online ed.) (last visited July 19, 2024); *see also United States v. Alexander*, No. 2:16-cr-141, 2017 U.S. Dist. LEXIS 101803, at *8 (D. Vt. June 30, 2017). Defendant can clearly be heard saying, "had a little bud," on the footage from the body-worn cameras. (Dkt. 45, Ex. 1, at 13:03–:05.) However, he gives the statement as "had a little burn" in his motion to suppress his statements. (Dkt. 38 at 12.) "Burn" is also a slang term associated with marijuana. *See Corbett v. Barnhart*, Civil Action No. 1:04cv241, 2006 U.S. Dist. LEXIS 101652, at *61 (N.D.W. Va. Feb. 23, 2006) (the phrase "just burn one" referring to smoking marijuana), *report and recommendation accepted in whole by* 2006 U.S. Dist. LEXIS 96519, at *91–92 (N.D.W. Va. Mar. 24, 2006), *aff'd sub nom. Corbett v. Astrue*, 234 F. App'x 117, 118 (4th Cir. 2007).

with law enforcement, and that he "ha[d] bud" and "was paranoid." (*Id.* at 11:28–12:00.)   An officer asked if Defendant used the marijuana "out in the woods somewhere," and Defendant said yes. (*Id.* at 12:00–:04.)   Defendant told the officers, "There might be a tiny little bud in my car." (*Id.* at 12:05–:10.)   He then added, "I scratched myself up trying to avoid y'all.  I didn't know y'all were looking for me, so I just went into the woods." (*Id.* at 12:15–:30.)

At 2:52PM, Defendant was *Mirandized* and indicated that he understood his *Miranda* rights[4] by nodding his head and saying, "Yes." (Dkt. 45, Ex. 2, at 1:22:58–:23:10.)   From 3:00PM to 3:05PM, paramedics treated Defendant's injuries. (Dkt. 45, Ex. 1, at 37:37–40:14.)   Over thirty minutes later, at 3:40PM, Defendant was in the back of a police car when an officer got in the driver's seat and asked him, "Are you comfortable temperature-wise?" (Dkt. 45, Ex. 2, at 2:10:55–:11:06.)   The officer also told Defendant that they were going to Defendant's vehicle and asked for the vehicle's location.  (*Id.* at 2:11:23–:27.)   Almost thirty seconds of silence followed, (*id.* at 2:11:30–:59), after which Defendant said, "I have been good.  I have been working on it, and I got myself in trouble," (*id.* at 2:11:59–:12:04).

### C. Show-Up Identifications

Earlier, at 2:31PM, the victim and her mother were asked to identify the man who had exposed himself, and they initially said that Defendant was not that man because that man had tattoos on his chest and arm and did not have long hair.  (Dkt.

---

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

45, Ex. 1, at 07:37–08:08.)  An officer told the victim and her mother where Defendant had been found, (*id.* at 08:42–:50), and that Defendant had been stopped earlier and was wearing a hat at that time, (*id.* at 15:31–:34, 16:35–:40).[5]  The officer also zoomed in on a picture of Defendant's face and showed it to the victim and her mother.  (*Id.* at 15:30–16:30.)  Both the officer and the mother then asked the victim to imagine Defendant with his hair tucked into a hat instead of in his face.  (*Id.* at 16:28–17:20.)  Eventually, the victim identified Defendant as the man who had exposed himself, (*id.* at 17:32–:38), and the mother identified Defendant as the man in the video that she had taken, (*id.* at 21:20–:30).

At 2:37PM, an officer asked the pursuing witness to identify Defendant.  (Dkt. 43, Ex. 6, at 1:07:39–:44.)  The police "might have somebody," the officer said, and wanted the pursuing witness to "take a look at him."  (*Id.*)  The officer then escorted the pursuing witness to Defendant's location.  (*Id.* at 1:08:08–:10:45.)  The officer drove by Defendant with the pursuing witness in the passenger seat of his police car and assured the pursuing witness that Defendant could not see him.  (*Id.* at 1:11:20–:30.)  At first, the pursuing witness was not sure that Defendant was the man he had chased.  (*Id.* at 1:11:30–:35.)  He added, however, that although he was "thrown off" by Defendant's long hair because the man he had chased had hair shorter than Defendant's, Defendant's body otherwise matched the man's.  (*Id.* at 1:11:30–:12:00.)

Two minutes later, at 2:43PM, another officer spoke with the pursuing witness.

---

[5] At 11:55AM on March 30, 2024, Defendant was pulled over for speeding and issued a warning. (Dkt. 43 at 4.)  Defendant was wearing a white hat at that time.  (Dkt. 43-1 at 8.)

(Dkt. 43, Ex. 7, at 19:09–:55.)  This officer said that Defendant had his hair tucked up into his hat.  (*Id.* at 19:16–:19.)  The pursuing witness then repeated that Defendant had the same body type as the man he had chased.  (*Id.* at 19:19–:23.)  The officer asked if the pursuing witness had seen the man's face, and he replied that the man looked Hispanic.  (*Id.* at 19:23–:28.)  The officer asked if the man had facial hair, and the pursuing witness said that he was not sure.  (*Id.* at 19:28–:33.)

At 2:53PM, Daniel and Lauren Williams (father and daughter) approached law enforcement about getting into their blocked vehicle.  (Dkt. 43, Ex. 8, at 1:23:35–:47.)  Mr. Williams said that he saw Defendant "smoking something," "watching [his] daughter" from under the stairs of a boardwalk, and "just loitering around right near where [their group of beachgoers was] sitting."  (*Id.* at 1:23:48–:24:26.)  Mr. Williams then said, "Yeah, we were wondering who it was," and "Somebody had asked if it was that guy."  (*Id.* at 1:25:25–:31.)  An officer asked if Mr. and Ms. Williams had seen a photo of Defendant, and Ms. Williams said no but they had "heard about him" being "a younger male."  (*Id.* at 1:25:39–:53.)  Mr. Williams said that the man they had seen loitering had "caramel[-]color[ed]" skin.  (*Id.* at 1:25:45–:52.)  The officer showed them a photo of Defendant, and they identified Defendant as the man who had been loitering.  (*Id.* at 1:25:52–:58.)   The officer then told them that law enforcement had a suspect and asked them if they would drive by and positively or negatively identify him.  (*Id.* at 1:26:03–:19.)  They agreed, (*id.* at 1:26:18–:19), and the officer said that Defendant "matched the description," (*id.* at 1:26:22–:26).  Mr.

and Ms. Williams then said that the man they had seen had on a white hat and black shorts. (*Id.* at 1:26:27–:30.) During a show-up, Mr. and Ms. Williams identified Defendant as the man they had seen loitering. (*Id.* at 1:42:39–:45.)

Defendant was ultimately charged with lewd or lascivious exhibition, in violation of 18 U.S.C. § 13 as assimilating section 800.04(7)(b), *Florida Statutes*. (Dkt. 16.) The court held hearings on Defendant's motions on July 11 and 18, 2024. (*See* Dkt. 62.) During the July 11, 2024 hearing, Mr. and Ms. Williams testified. (*Id.* at 28–54.) As pertinent here, Mr. Williams stated that when he went to his car, he saw Defendant smoking something in Defendant's vehicle, which was parked in a space adjacent to Mr. Williams's car. (*Id.* at 30.) Mr. Williams testified that he was ten feet away from Defendant, looked at him for a few minutes, and saw that Defendant was wearing black shorts, no shirt, and no hat in his vehicle. (*Id.* at 30–31.) Defendant had been wearing a hat, Mr. Williams testified, when Defendant was "lurking around" a pier and "eyeing" multiple girls, but Defendant had his hair tied up when he was in his vehicle. (*Id.* at 30–31, 38.) Mr. Williams further testified that Defendant was standing twenty feet away from him and Ms. Williams when Defendant was loitering alone under a pier. (*Id.* at 45.) Defendant had caught Mr. Williams's attention, Mr. Williams stated, because Defendant was looking at his daughter. (*See id.* at 44.) Ms. Williams also testified that Defendant had been staring at girls at the park. (*Id.* at 49–50.) Both she and her father described an incident in which she needed to use the restroom at the park but she decided not to go until later because she saw Defendant

nearby.  (*Id.* at 32, 50.)  As to the show-up, Mr. Williams testified that he drove by Defendant slowly and in his own car, (*id.* at 33–34, 43–44), and Ms. Williams testified that she rode in a police car and that four hours passed between when she first noticed Defendant loitering and the show-up of Defendant, (*id.* at 50–51).

## LEGAL STANDARDS

"[T]he Fifth Amendment privilege [against self-incrimination] is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966).  Protecting this privilege requires "proper safeguards," commonly known as *Miranda* warnings. *Id.*  "Law enforcement must issue *Miranda* warnings when a subject is both 'in custody' and under 'interrogation' by police officers." *United States v. Lightbourn*, 357 F. App'x 259, 265 (11th Cir. 2009) (quoting *United States v. Castro*, 723 F.2d 1527, 1530 (11th Cir. 1984)).  Because "the burdens of production and persuasion generally rest upon the movant in a suppression hearing," a defendant must show that his statement "was obtained while he was under custodial interrogation." *United States v. De la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977).  If he satisfies this burden, "the government then has the burden of proving that [he] voluntarily waived his privilege against self-incrimination." *Id.*; *accord United States v. Woodson*, 30 F.4th 1295, 1302.  At that point, "[t]he government must prove by a preponderance of the evidence that [the defendant] made a knowing, voluntary[,] and intelligent waiver of his *Miranda* rights." *United*

*States v. Farris*, 77 F.3d 391, 396 (11th Cir. 1996).

The Fifth Amendment right to due process protects against unduly suggestive identifications. *See United States v. Dixon*, 401 F. App'x 491, 494 (11th Cir. 2010). An identification procedure used by law enforcement violates due process if the procedure is "unnecessarily suggestive" and, in its suggestiveness, it "create[s] a substantial risk of misidentification." *Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987). The defendant bears the initial burden of showing that the identification procedure was unnecessarily suggestive, and if the defendant meets that burden, the government must "show that the identification was reliable independent of the suggestive procedure." *United States v. Henry*, 939 F. Supp. 2d 1279, 1283 (citing *United States v. Wade*, 388 U.S. 218, 240 (1967)).

## ANALYSIS

Defendant moves to suppress his statements to law enforcement under *Miranda* and to exclude them under Federal Rules of Evidence 401, 402, 403, and 404. (*See* Dkt. 38.) He also moves to suppress the witnesses' identifications of him on due-process grounds. (*See* Dkt. 39.) The court addresses the challenged statements and identifications in turn.

### 1. Statements

*Miranda* "requires that [a suspect] be warned prior to 'custodial interrogation' that he has the right to remain silent and to have an attorney present." *United States v. Lopez-Garcia*, 565 F.3d 1306, 1316 (11th Cir. 2009). A suspect is "in custody" for

*Miranda* purposes if, "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement . . . to such extent that he would not feel free to leave." *United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987). "'[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted). An "incriminating response" "refer[s] to any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." *Id.* n.5 (emphasis omitted). Although incriminating statements made "in response to" an interrogation are inadmissible, "[v]oluntary incriminating statements . . . not made in response to an officer's questioning are freely admissible." *United States v. Suggs*, 755 F.2d 1538, 1541 (11th Cir. 1985). Also, "requesting 'routine' information for booking purposes is not an interrogation under *Miranda*." *United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983).

Even when statements are admissible under *Miranda*, they may be excluded because they are irrelevant, Fed. R. Evid. 402—in that they do not have "any tendency to make a fact [of consequence] more or less probable," Fed. R. Evid. 401—or because their "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403. Additionally, statements evidencing a defendant's "character or character trait" or "any other crime, wrong, or

act" committed by the defendant are inadmissible "to prove that on a particular occasion the [defendant] acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1), (b)(1). When statements concern the defendant's flight, their probative value

> depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*United States v. Wright*, 392 F.3d 1269, 1278 (11th Cir. 2004) (quoting *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977)).

Defendant argues that his post-detention "statements concerning his prior encounter with officers and his alleged flight from the police" and his statement, "I have been good. I have been working on it, and I got myself in trouble," must be suppressed under *Miranda* because he made the statements in response to custodial interrogation. (Dkt. 38 at 7–9.) Defendant further maintains that his statement, "I have been good. I have been working on it, and I got myself in trouble," should be excluded because it is "too vague to be relevant" and "invite[s] the jury to speculate that [he] has an uncontrollable urge to engage in inappropriate sexual behavior." (*Id.* at 10.) With respect to his statements that he fled from the police, Defendant contends that "the connection between the alleged flight in this case and consciousness of guilt for the specific offense charged is too tenu[ou]s to be probative." (*Id.* at 11–12.)

When Defendant was detained on the beach, he was handcuffed, surrounded by five officers and a canine, and escorted to a location so the victim could identify

him.  (*See* Dkt. 45, Ex. 1, at 04:05.)  He remained handcuffed and in the presence of one or more officers during the encounter at issue.  "[A] reasonable man in [Defendant]'s position would feel a restraint on his freedom of movement . . . to such extent that he would not feel free to leave."  *Phillips*, 812 F.2d at 1360.  Thus, Defendant was "in custody" for *Miranda* purposes when he made all the statements at issue.  *See id.*; *New York v. Quarles*, 467 U.S. 649, 652, 655 (1984) (finding that a defendant was in custody under *Miranda* when he was "surrounded by at least four police officers" in a supermarket and "handcuffed when the questioning at issue took place").  While Defendant was in custody and before he was *Mirandized*, he made statements about his girlfriend, his injuries, his hat, his vehicle, the manhunt, his previous traffic stop, and his flight from police, and he provided basic pedigree information.  Defendant does not dispute that police may collect pedigree information from suspects.  *See Sims*, 719 F.2d at 378.  The court discusses the remaining statements in turn.

Defendant's statements about his girlfriend do not need to be suppressed because he made them in response to questioning about whether he was at the park with anyone else.  The officers had no reason to believe that such questioning would be reasonably likely to elicit an incriminating response.  Although the officers knew that the suspect acted alone when he allegedly exposed himself, they did not know if he was at the park with anyone else.  It made practical sense to ask Defendant if he was with anyone else because he was leaving the area in police custody.  *See United States v. Lopez-Garcia*, 565 F.3d 1306, 1317 (11th Cir. 2009) (concluding that "no

*Miranda* warning was necessary" before an interview because the interviewing officer should not "have known that [the defendant] was reasonably likely to make self-incriminating statements during" the interview).

Regarding Defendant's injuries and hat, his seeming assertion that the saltwater had burned his shins and his statements that he did not have a hat must be suppressed because officers believed that the suspect had fled through sawgrass, which causes cuts, and had gotten rid of his hat in the ocean. Thus, questions about whether the saltwater in the ocean burned the cuts on Defendant's shins and whether Defendant had a hat—and if so, what he did with it—would be reasonably likely to elicit incriminating responses related to Defendant's alleged flight. *See United States v. Phillips*, 146 F. Supp. 3d 837, 847 (E.D. Mich. 2015) ("Questioning a defendant about the location of evidence constitutes interrogation under *Miranda*."); *cf. United States v. Rodriguez*, No. 17-00112-01-CR-W-BP, 2019 U.S. Dist. LEXIS 164143, at *11 (W.D. Mo. Sep. 25, 2019) ("[An officer's] question regarding why [the d]efendant chose to run away amount[ed] to a custodial interrogation since the question was likely to elicit an incriminating response."). However, Defendant's later voluntary statement, "I scratched myself up trying to avoid y'all," does not need to be suppressed. *See Suggs*, 755 F.2d at 1541 ("Voluntary incriminating statements . . . not made in response to an officer's questioning are freely admissible.").

Defendant's statements about his vehicle do not need to be suppressed because he made them in response to questioning that the officers had no reason to believe would be reasonably likely to elicit an incriminating response. The officers had

practical reasons for asking about Defendant's vehicle because they needed to know what to do with it once Defendant left the area in police custody.  *Cf. United States v. Jones*, 543 F.2d 1171, 1173 (5th Cir. 1976) ("[R]outine inquiries into the ownership of a stopped vehicle, the identity of its driver or occupants, and other such matters by law enforcement personnel do not constitute custodial interrogation."); *United States v. Howard*, No. 21-11101, 2023 U.S. App. LEXIS 2342, at *10–11 (11th Cir. Jan. 30, 2023) (finding no *Miranda* violation when an officer asked the defendant where the keys to his car were because the defendant had been lawfully detained by then and the officer had probable cause to search the car).  Indeed, Defendant himself wanted to know whether his vehicle would get towed.  *Cf. United States v. Carlton*, 237 F. App'x 530, 533 (11th Cir. 2007) (noting that the defendant "was cooperative with police and directed police to his car").

Defendant's statements about the manhunt—that is, his assertion that he hoped the officers got everything "figured out" and his utterance, "Crazy"—must be suppressed.  The statements came in response to an officer's comment to Defendant that "You [Defendant] had us [officers] walking"—that is, searching the area.  This comment was the equivalent of directly accusing Defendant of committing the offense and so constituted a custodial interrogation.  *See United States v. Gomez*, 927 F.2d 1530, 1537–38 (11th Cir. 1991) ("[M]any techniques of persuasion which are not 'questioning' f[a]ll under the interrogation rubric . . . ."); *Jacobs v. Singletary*, 952 F.2d 1282, 1285, 1291 (11th Cir. 1992) (habeas case) (holding that the defendant's response to an officer's question "Do you like shooting troopers?" should have been excluded

- 15 -

under *Miranda* when the defendant was convicted of murder related to a state-trooper shooting); *Castro*, 723 F.2d at 1530 & n.2 (finding that an officer's accusatory question "What in the world is going on here?" was not "a statement normally attendant to arrest" but rather "amount[ed] to an interrogation").  As a result, Defendant's statements about the manhunt must be suppressed.

As to Defendant's statements about his previous traffic stop and his flight from police during the manhunt, Defendant's initial nod and "yes" confirming that he had been pulled over earlier that day must be suppressed because the officer should have known that asking about a traffic infraction would be reasonably likely to elicit a response that the prosecution may seek to introduce at trial.  *See Phillips*, 146 F. Supp. 3d at 847 ("[Q]uestioning [a] defendant about his criminal history . . . constitutes interrogation . . . .").  However, the officer's question was limited to the fact of the traffic stop.  Nothing about the question suggested a link between the previous traffic stop and Defendant's conduct during the manhunt, nor did the question probe Defendant's motivations for his behavior during either the traffic stop or the manhunt. Instead, Defendant volunteered additional information nonresponsive to the officer's question when Defendant said that his "paranoi[a]" from getting pulled over earlier that day had caused him to "hide" and "run[]" from the police during the manhunt. The officer had moved on from asking about the traffic stop and was collecting pedigree information when Defendant "apologize[d] for running" and repeated that he was "spooked" because "the other day," he "got pulled over for speeding." Defendant's voluntary, nonresponsive statements do not need to be suppressed.  *See*

*Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."); *see also Castro*, 723 F.2d at 1530 (finding that the defendant's statement "You want money?  We got money" was "totally unresponsive to" the officer's question "What in the world is going on here?" and thus not protected under *Miranda*).

Although an officer then asked why Defendant was spooked about a minor traffic infraction like speeding, Defendant's response that he "had a little bud," saw the police, got "nervous," and "just tried to get away" does not need to be suppressed because officers may ask clarifying questions when defendants volunteer information. When an officer follows up on "a defendant's spontaneous statements" "for the sake of clarification," the defendant's response need not be suppressed under *Miranda*. *United States v. Villegas-Tello*, 319 F. App'x 871, 875 (11th Cir. 2009).  Officers may seek clarification by asking why.  *United States v. Quarterman*, No. 1:21-cr-16-AW-GRJ, 2022 U.S. Dist. LEXIS 180266, at *2, 5 (N.D. Fla. Feb. 23, 2022) (finding "no *Miranda* violation" when a defendant asked an officer to leave the defendant's backpack in the woods, the officer asked why, and the defendant said that "the backpack's contents would get him sent to prison"); *cf. Taylor v. Sec'y, Fla. Dep't of Corr.*, 64 F.4th 1264, 1273 (11th Cir. 2023) (habeas case) ("A reasonable jurist could interpret [the officer]'s question—'Why?'—in response to [the defendant]'s question as ordinary, run-of-the-mill conversation rather than the sort of query that a reasonable officer would have known would elicit an incriminating response.").  Here, when the officer asked Defendant why he was spooked about speeding, the officer sought clarification for an

odd statement; the officer had no reason to believe that the question would lead Defendant to mention marijuana. *See Quarterman*, 2022 U.S. Dist. LEXIS 180266, at *5. Likewise, when an officer asked if Defendant's ticket was for speeding after Defendant had already said that it was, the officer was asking a permissible clarifying question. *See Villegas-Tello*, 319 F. App'x at 875. After Defendant volunteered the information about his marijuana use, the officer's question about where Defendant used the marijuana was also a clarifying question. *See id.*

Defendant contends that the evidence of his flight from the police should be excluded because there is insufficient support for the jury to move along the chain of inferences from his flight to consciousness of guilt and from consciousness of guilt to consciousness of guilt concerning lewd or lascivious exhibition. (Dkt. 38 at 11–12.) The jury cannot move from his flight to consciousness of guilt, he argues, because "no evidence suggest[s] that a witness had formally accused [him] of [criminal] conduct prior to his alleged flight" and because he could have been running away from the victim's mother, who had threatened to tase the suspect. (*Id.* at 12.) However, the large police presence during the manhunt made it obvious that someone had been accused of a crime. And other evidence—for example, Defendant's statement that he got himself in trouble—supports Defendant's consciousness of guilt. Defendant further maintains that if he were conscious of guilt, it was guilt for "using marijuana at the beach," not for lewd or lascivious exhibition. (*Id.*) But it is "for the jury to infer whether his guilt sprang from" lewd or lascivious exhibition or marijuana use. *See Wright*, 392 F.3d at 1279.

As for Defendant's post-*Miranda* statement, "I have been good.  I have been working on it, and I got myself in trouble," Defendant spontaneously volunteered the statement.  He did not make it in response to the officer's questioning.  Thirty seconds of silence filled the space between the officer's questions and Defendant's statement. (Dkt. 45, Ex. 2, at 2:11:30–:59.)  *See Lightbourn*, 357 F. App'x at 265–66 (looking to the length of time between an officer's questions and a defendant's statements as support for the statements' spontaneity).  Moreover, Defendant's statement did not logically follow as a response to the officer's questions about Defendant's comfort level "temperature-wise" in the police car and the location of Defendant's vehicle.  *See Castro*, 723 F.2d at 1530.  Because the statement was "[v]oluntary" and "not made in response to [the] officer's questioning," it is "freely admissible" under *Miranda*.  *See Suggs*, 755 F.2d at 1541.[6]

Defendant disputes his post-*Miranda* statement's relevance and probative value. (Dkt. 38 at 10.)  Defendant's statement, "I got myself in trouble," is relevant to and highly probative of Defendant's consciousness of guilt.  *Cf. United States v. Meling*, 47 F.3d 1546, 1557 (9th Cir. 1995) (a confession is highly probative of consciousness of guilt).  This statement will thus not be excluded under Rule 403.  *See United States v. Gbenedio*, 95 F.4th 1319, 1331 (11th Cir. 2024) ("A district court's discretion to exclude

---

[6] Defendant argued at the July 11, 2024 hearing that the officers' tactics of oversharing about Defendant with the paramedics who were treating him and telling Defendant the factual allegations against him when he wanted the charges against him, not the factual allegations, created a coercive environment to elicit incriminating responses from Defendant.  The court disagrees.  Defendant was capable of making voluntary statements.  *See Castro*, 723 F.2d at 1530 (finding that the defendant "was in custody" and "was the subject of a custodial interrogation" but was capable of making a statement that was "totally voluntary and clearly outside the protective umbrella of *Miranda*").

evidence as unduly prejudicial is 'narrowly circumscribed.'" (quoting *United States v. McGregor*, 960 F.3d 1319, 1324 (11th Cir. 2020))); *United States v. Brown*, 441 F.3d 1330, 1362 (11th Cir. 2006) ("In reviewing issues under Rule 403, [courts] look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact."); *cf. United States v. Yepa*, 862 F.3d 1252, 1253, 1260–61 (10th Cir. 2017) (in a felony-murder case where aggravated sexual abuse was the predicate felony, affirming the district court's ruling that the defendant's recorded statements were spontaneous—and thus admissible under *Miranda*—when the recording was inaudible in several places and the statements included vague language like "Oh, man, it got sick, dude," "I don't wanna mention no names right now and get anybody in trouble, you know," "[E]verything was good," "I'm gonna be in trouble," "[T]hen all of this stupid drama happens," and "I've been good, man").

Defendant also asserts that the Government cannot use his post-*Miranda* statement as evidence of his propensity to engage in sexual conduct involving minors. *See* Fed. R. Evid. 404.  The court agrees.  The statement does not identify any other crimes, wrongs, or acts committed by Defendant, but the "I have been good.  I have been working on it" portion of the statement could be construed as evidence of Defendant's character.  Because only the "I got myself in trouble" portion is relevant to show Defendant's consciousness of guilt, the rest of the statement will be excluded. *Cf. Teel v. Lozada*, 99 F.4th 1273, 1287 (11th Cir. 2024) ("conclud[ing] that the district court did not abuse its discretion in ruling that evidence of [the defendant]'s 'rough patch' constituted improper character evidence").

## 2. Identifications

"A pretrial identification and subsequent in-court identification may amount to a due process violation if the pretrial procedure was 'unnecessarily suggestive and conducive to irreparable mistaken identification.'" *Jones v. Kemp*, 794 F.2d 1536, 1539 (11th Cir. 1986) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)).  Show-ups refer to "showing suspects singly to persons for the purpose of identification," *Stovall*, 388 U.S. at 302, and "are not unnecessarily suggestive unless the police aggravate the suggestiveness of the confrontation," *Johnson*, 817 F.2d at 729.  Even when officers employ an unnecessarily suggestive procedure, an identification is admissible if "under the 'totality of the circumstances[,]' the identification was reliable." *Neil v. Biggers*, 409 U.S. 188, 199 (1972).  To determine the reliability of a witness's identification, courts consider five factors: (1) the witness's "opportunity . . . to view the criminal at the time of the crime"; (2) "the witness'[s] degree of attention"; (3) "the accuracy of the witness'[s] prior description of the criminal"; (4) "the level of certainty demonstrated by the witness at the confrontation"; and (5) "the length of time between the crime and the confrontation." *Id.* at 199–200.

Defendant asserts that all the show-up identifications of him by witnesses at the park were unduly suggestive and lack reliability and that any in-court identifications of him by these witnesses should also be excluded.  (Dkt. 39 at 13–23.)  The Government agrees that the show-up identifications by the victim and her mother were suggestive enough to warrant exclusion, and it represents that it will not introduce these identifications at trial or ask the victim or her mother to make in-court

identifications of Defendant.  (Dkt. 43 at 1, 6–7.)  The Government requests that the court suppress the show-up and the conversation that occurred during it "in its entirety" to prevent Defendant from "pick[ing] and choos[ing]" portions of the conversation during cross-examinations.  (*Id.* at 7.)  The Government also represents that it will not call the pursuing witness at trial.  The Government otherwise opposes Defendant's motion to suppress identifications.  (*See id.* at 6–10.)

Based on the Government's response, the court will suppress the show-up identifications by the victim, her mother, and the pursuing witness and any in-court identifications of Defendant by these three witnesses.  As to Mr. and Ms. Williams, Defendant argued at the July 11 and 18, 2024 hearings that the officer made the show-up unduly suggestive because immediately before the show-up, the officer showed Defendant's photo to Mr. and Ms. Williams and told them that law enforcement had a suspect who "matched the description."  Even if these actions made the show-up unduly suggestive, Mr. and Ms. Williams's identifications of Defendant as the man they had seen loitering are admissible because the identifications were nevertheless reliable under the totality of the circumstances.

Regarding the first *Neil* factor, *see* 409 U.S. at 199, although neither Mr. nor Ms. Williams viewed the suspect in the act of exposing himself, both witnesses had ample opportunity to view the man who had been loitering around and looking at girls, and Mr. and Ms. Williams's identifications could provide circumstantial evidence that the man who exposed himself had been looking for a victim.  Mr. and Ms. Williams had multiple opportunities to view the loitering man.  At one point, Mr. Williams looked

- 22 -

at him from ten feet away for a few minutes, and at another point, the man stood twenty feet away from Mr. and Ms. Williams. *See United States v. Burke*, 738 F.2d 1225, 1229 (11th Cir. 1984) (finding that the first factor supported reliability when the man who was identified had been "in [the identifying witness]'s presence long enough for her to closely observe him"); *cf. Jones v. Smith*, 772 F.2d 668, 671 (11th Cir. 1985) (habeas case) (finding that the first factor supported reliability when the identifying witness observed the defendant for a "five-minute period . . . under good lighting conditions").

Regarding the second *Neil* factor, *see* 409 U.S. at 199, Mr. and Ms. Williams paid a great deal of attention to the loiterer.  Mr. Williams noticed that the man was looking at his daughter.  *See United States v. Douglas*, 489 F.3d 1117, 1126 (11th Cir. 2007) (noting that the identifying witness's "attention was certainly focused on the perpetrator . . . as [the witness] was attempting to ensure not only her own safety, but the safety of her child"), *abrogated on other grounds as stated in United States v. Whatley*, 719 F.3d 1206, 1216 (11th Cir. 2013).  Ms. Williams went so far as to avoid visiting the restroom because the man was standing near it.  *See United States v. Caldwell*, 963 F.3d 1067, 1075–76 (11th Cir. 2020) (finding that the second factor supported reliability when the identifying witness "was focused on" the perpetrator).

Regarding the third factor, *see Neil*, 409 U.S. at 199, the description of the loiterer's skin tone matched Defendant's skin tone.  *See Caldwell*, 963 F.3d at 1075–76 (finding support for reliability when the suspect's skin tone matched the defendant's).  Furthermore, the witnesses accurately identified Defendant from a photo prior to the

show-up.

Regarding the fourth factor, *see Neil*, 409 U.S. at 199, Mr. and Ms. Williams "expressed a high level of certainty in making" their identifications of Defendant. *United States v. Daniels*, 97 F.4th 800, 810 (11th Cir. 2024).

Finally, regarding the fifth factor, *see Neil*, 409 U.S. at 199–200, Ms. Williams testified that only four hours passed from when she first noticed the loiterer and when she and Mr. Williams participated in the show-up.  Additionally, as mentioned above, Mr. and Ms. Williams noticed the loiterer multiple times between that first time and the show-up.  *See Daniels*, 97 F.4th at 810 (holding that "very little time elapsed between the crime and the identification" when "[o]nly three days had passed"); *Burke*, 738 F.2d at 1229 (finding that a period of "[a]pproximately two months" supported reliability under the fifth factor); *Douglas*, 489 F.3d at 1127 (holding that a period of several months between a crime and an in-court identification "was not so long as to lead to the conclusion that the identification was unreliable").

Because all the *Neil* factors support the reliability of Mr. and Ms. Williams's identifications of Defendant, the identifications do not need to be suppressed.

## CONCLUSION

Accordingly:

1. Defendant's motions to suppress (Dkts. 38 & 39) are **GRANTED in part and DENIED in part**.

2. Defendant's pre-*Miranda* statements about his injuries, his hat, and the manhunt

and his initial nod and "yes" confirming his previous traffic stop are **SUPPRESSED**.

3. The show-up identifications by the victim, her mother, and the pursuing witness and any in-court identifications of Defendant by these three witnesses are **SUPPRESSED**.

4. The "I have been good.  I have been working on it" portion of Defendant's post-*Miranda* statement is **EXCLUDED**.

5. Defendant's motions to suppress are otherwise **DENIED**.

**ORDERED** in Orlando, Florida, on July 19, 2024.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record